**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                            )
JEFFREY WALTERS and ESTATE OF   )
CLIFFORD HADDOX,                        )          Civil Action No.: 09-4637 (FLW)
                                            )
              Plaintiffs,                   )          **OPINION**
v.                                          )
                                            )
AMERICAN HOME ASSURANCE ,     )
                                            )
              Defendant.                    )
_____)

**WOLFSON, United States District Judge:**

> Presently before the Court is Defendant American Home Assurance's ("Defendant's" or "American Home's") Motion for Summary Judgment and Plaintiffs Jeffrey Walters' and the Estate of Clifford Haddox's (collectively, "Plaintiffs'") Cross-Motion for Summary Judgment. This dispute centers on whether Plaintiffs are entitled to coverage for an automobile accident that occurred while Plaintiffs were driving a pick-up truck ("Vehicle") leased by their former employer, Orgo-Thermit, Inc. ("OTI").   For the following reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Cross-Motion for Summary Judgment is denied.

**I.      FACTS AND PROCEDURAL HISTORY**

> The following facts are undisputed by the parties.  Beginning on January 1, 2004, OTI, a New Jersey corporation, was insured under Business Auto Policy CA 359-56-38 ("Policy") issued by American Home, a New York corporation.  Ferguson Afft., ¶ 4.  The Policy is a multi-

state policy that covered vehicles operated by OTI throughout the United States.[1]  The Policy

provides $1,000,000 in general liability coverage to "symbol 1" vehicles.  "Symbol 1" vehicles

include "any 'auto.'"  Ferguson Afft., Exh. 1 ("Business Auto Coverage Form") at 1.[2]

Throughout this Opinion, I will refer to this section of the Policy as the "Master Policy."  I refer

to the entire policy as "Policy."

Important here is the Policy's $1,000,000 in uninsured motorist ("UM") coverage, which

coverage is referenced in the Master Policy.  Unlike the general liability coverage, the Policy's

UM coverage applies to "symbol 2" vehicles, which are defined as "only those 'autos' you

own…." Id.  ("You" and "Your" refers to the Named Insured, OTI.  Id. at 1.)  The Policy does

not provide UM insurance for "symbol 8" vehicles, which are defined as "autos you lease, hire,

rent or borrow that are used in connection with your business."  Business Auto Coverage Form at

1.

Appended to the Master Policy are numerous endorsements.  Some endorsements are not

state-specific, such as the NUCLEAR ENERGY LIABILITY EXCLUSION Endorsement, id.,

Exh. 1 ("Nuclear Energy Liability Exclusion Endorsement") at 1, while others are state-specific,

such as the WISCONSIN CHANGES endorsement, id., Exh. 1 ("Wisconsin Changes") at 1, the

MINNESOTA PERSONAL INJURY PROTECTION endorsement, id., Exh. 1 ("Minnesota

Personal Injury Protection"), and the WISCONSIN UNINSURED MOTORIST COVERAGE

endorsement, id., Exh. 1 ("Wisconsin Uninsured Motorist Coverage").   The state-specific

endorsements are for the following states:    Wisconsin, Minnesota, New Jersey, and

---

[1]      According to OTI, it uses vehicles licensed in various state, such as New Jersey and
Wisconsin, for work completed in "a number of states, including North Carolina, Florida,
Kentucky, Virginia, Colorado, and Wisconsin." Dry Supp. Afft., ¶ 4-5.

[2]      As the Policy, attached as an exhibit to the Ferguson Affidavit, does not contain page
numbers throughout its entirety, the Court will refer to documents by their title and respective
page numbers for that particular document.

Pennsylvania.  Many of the state-specific endorsements state that they apply to "a covered 'auto' licensed or principally garaged in . . ." that state.  Id.

Of the state-specific endorsements, the parties argue that two are relevant here.  The first is the NEW JERSEY UNINSURED AND UNDERINSURED MOTORISTS COVERAGE endorsement.  Id., Exh. 1 ("New Jersey Uninsured and Underinsured Motorists Coverage") at 1. The second is the PENNSYLVANIA UNINSURED MOTORIST COVERAGE endorsement. Id., Exh. 1 ("Pennsylvania Uninsured Motorists Coverage") at 1.

The New Jersey endorsement states that an insured entitled to recover on an uninsured motorist claim is one who occupies a "covered 'auto'."  New Jersey Uninsured and Underinsured Motorists Coverage at 2.  The New Jersey endorsement further provides that claims for bodily injury are excluded "unless the injured person has a legal right to recover damages for such pain, suffering and inconvenience under the New Jersey Automobile Reparation Reform Act."  Id.  In this way, "[t]he injured person's legal right to recover damages for such pain, suffering and inconvenience under the New Jersey Automobile Reparation Reform Act will be determined by the liability tort limitation, if any, applicable to that person."  Id.  Importantly, the endorsement states that it applies only to those covered autos "licensed or principally garaged in . . . New Jersey."  Id.

The Pennsylvania endorsement includes some language similar to that of the New Jersey endorsement.  It provides for coverage for anyone occupying a "covered motor vehicle." Pennsylvania Uninsured Motorists Coverage at 1-2.  Unlike the New Jersey endorsement, however, the Pennsylvania endorsement does not speak of limited tort status.  In addition, the Pennsylvania endorsement includes a limitations period.  It states that any legal action "must be brought within four years after the date of the 'accident' . . . [unless], within four years after the

3

date of the 'accident,' [American Home] or the 'insured' have made a written demand for arbitration in accordance with the provisions of this endorsement." Id. at 2.  It also states that it applies only to those covered autos "licensed or principally garaged in . . . Pennsylvania." Id. at 1.

On May 5, 2004, several months after the Policy was issued, OTI began leasing a Ford pick-up truck from Danella Rental Systems ("Danella"), a Pennsylvania corporation.  Randall Afft., ¶ 5.  Pursuant to the Danella lease agreement, OTI was required "to carry and maintain . . . Auto Liability [insurance] with limits of liability of no less than $1,000,000."  Dry Afft., Exh. 1 ("Danella Rental Systems, Inc. Equipment Rental Agreement") at 1.  The lease agreement also required that OTI "name [Danella] as an additional insured" on the policy that covered OTI's vehicles.  Id.  Furthermore, the lease agreement requires that OTI "comply with the applicable requirements of law relating to the . . . insurance, use and operation" of the Vehicle.

Importantly, there is another non-state-specific endorsement to the Policy that adds as an additional insured those to whom OTI is obligated by contract to so include.  Ferguson Afft., Exh. 1 ("ADDITIONAL INSURED – WHERE REQUIRED UNDER CONTRACT OR AGREEMENT").  That endorsement, which I will refer to as the "Additional Insured Endorsement," provides:

> Any person or organization to whom you become obligated to include as an additional insured under this policy, as a result of any contract or agreement you enter into which requires you to furnish insurance to that person or organization of the type provided by this policy, but only with respect to liability arising out of your operations or premises owned by or rented to you.  However, the insurance provided will not exceed the lesser of:
>
> 1.    The coverage and/or limits of this policy, or
>
> 2.    The coverage and/or limits required by said contract or agreement.

4

Id.

Sometime in 2004, OTI directed two employees, Plaintiff Jeffrey Walters and Clifford Haddox, who were residents of Ohio, Notice of Removal, ¶ 4, to drive the pick-up truck through the State of Wyoming on business. The truck "originated" in Denver, and the employees were "on their way to a job in California." Dry Supp. Afft., ¶¶ 6-7. On November 27, 2004, while in Wyoming, Plaintiffs were struck by a phantom vehicle and the truck rolled into a ditch. Both Walters and Haddox sustained injuries. The parties do not dispute that, as employees of OTI, Walters and Haddox are considered insureds under the OTI Policy.

Plaintiffs notified American Home of their claims on September 2, 2005, by way of letter by their counsel at that time. Ferguson Afft., Exh. 2 (Letter from William J. Vosper, Esq. dated Sept. 2, 2005) at 1.[3] In that letter, Plaintiffs' former counsel asserted that Plaintiffs were entitled to coverage because they were driving a covered auto, and that Pennsylvania law should apply to their claims because the pick-up truck was licensed, registered, and rented in Pennsylvania. Plaintiffs' former counsel also referenced the Policy's arbitration clause but did not seek to compel arbitration. Id. at 2.

One of Defendant's claim representatives responded to Plaintiffs' former counsel on November 21, 2005. In that correspondence, the representative stated that "[w]e are confirming that [the pick-up truck] is in fact owned by our insured …." Levinson Afft., Exh. A (Letter from

---

[3]     Defendant asks this Court to strike the correspondence submitted by Plaintiffs, which correspondence the Court summarizes hereafter, as not properly authenticated and containing confidential settlement information. The Court need not rule on Defendant's motion to strike because, for reasons explained below, even assuming the correspondence is properly authenticated and does not contain confidential settlement information, the Court does not find that reference to the correspondence supports Plaintiffs' assertion that Defendant fraudulently or in bad faith lulled Plaintiffs into believing Defendant would not raise a statute of limitations defense.

Jeffrey E. Lucas dated Nov. 1, 2005) at 1. The following year, on August 17, 2006, the representative sent further correspondence to Plaintiffs' former counsel. In that correspondence, the representative stated that "[i]t is our understanding that you are still putting together [the Plaintiffs'] UIM demands." Id., Exh. A (Letter from Jeffrey E. Lucas dated Aug. 17, 2006) at 2.

The following day, August 18, 2006, Plaintiffs' former counsel responded with a letter setting forth a demand of $75,000. Id., Exh. A (Letter from William J. Vosper, Esq. dated Aug. 18, 2006) at 4. Plaintiffs' former counsel sent a second letter to Defendant on December 7, 2006, reasserting Plaintiffs' claim. Id., Exh. 3 (Letter from William J. Vosper, Esq. dated Dec. 7, 2006) at 1-2. In that letter, Plaintiffs' former counsel stated that he would "decide if [Plaintiffs] should file a lawsuit in Pennsylvania, Ohio, Wyoming or New Jersey, or chose [sic] to arbitrate the matter." Id. at 2.

Several days later, on December 15, 2006, Defendant issued a letter denying UM coverage. The letter explained that OTI's "policy, for UM/UIM coverage, only insures owned vehicles. . . . As we have discussed this vehicle was on a month to month lease. It is not an owned auto. Therefore it does not fit the definition of an owned auto." Ferguson Supp. Afft., Exh. 1 (Letter from Jeffrey B. Lucas dated Dec. 15, 2006). The letter further stated that "we question whether a 'phantom vehicle' triggers UM/UIM coverage under the policy." Id.

Following the denial, six months later, Plaintiffs' former counsel sent another letter to Defendant's counsel, McCormick Barstow, LLP, on June 4, 2007 addressing the question of choice of law. Id., Exh. 3 (Letter from William J. Vosper, Esq. dated June 4, 2007) at 1. In that letter, counsel argued that Pennsylvania law applied because "the **Pennsylvania UM/UIM** endorsement was issued for delivery in Pennsylvania and applies to a vehicle **registered** in Pennsylvania, **garaged** in Pennsylvania from time to time, driven through Pennsylvania, and

6

**owned** by [Danella], an **additional insured** on the AIG policy." Id. at 2 (emphasis in original). The letter engaged in additional choice of law analysis, and further noted that "it is not known where the policy was issued." Id. at 3. Nonetheless, counsel argued, "the Pennsylvania UM/UIM endorsement is a clear choice of Pennsylvania law for determining UM/UIM coverage with regard to a vehicle registered and garaged at times in Pennsylvania …." Id. (emphasis in original).

On September 29, 2007, Plaintiffs' former counsel sent a letter with an increased demand for Jeffrey Walters, in part, "[t]o avoid . . . respective costs of litigation for uninsured motorist benefits in one of several jurisdictions …." Id., Exh. A (Letter from Maryjean Ellis, Esq., dated Sept. 29, 2007) at 1. By that date, Clifford Haddox had passed away and counsel continued to advocate on behalf of his estate. Id. at 2.

From June 23, 2008, through April 20, 2009, Plaintiffs' former counsel and one of Defendant's representatives exchanged emails discussing settlement possibilities. See Levinson Afft., Exh. B. Then, on April 27, 2009, Plaintiffs' former counsel informed Defendant that Mr. Walters decided to retain new counsel. Id.

Two months later, on July 20, 2009, Plaintiffs filed a complaint, through new counsel, in the Superior Court of New Jersey, Middlesex County, seeking UM benefits and an order compelling Defendant to arbitrate pursuant to the terms of the Policy. Verif. Compl. at ¶ 4. Defendant removed the case to this Court and filed an Answer and Counterclaim on September 16, 2009. Defendant's Counterclaim seeks a declaratory judgment that Plaintiffs were not

covered under the Policy. Def.'s Answer and Countercl. ¶¶ 4-8. Plaintiffs subsequently filed an

Order to Show Cause to compel arbitration, which Order this Court denied on July 21, 2010.[4]

The instant matter before the Court is Defendant's Motion for Summary Judgment and

Plaintiffs' Cross-Motion for Summary Judgment.  Both parties argue that they are entitled to

summary judgment based on a plain reading of the Policy, and disagree as to which state's law

should govern interpretation of the Policy.  For the following reasons, I conclude that

Pennsylvania law applies and that, under that state's law, Plaintiffs' claims are barred by the

statute of limitations.  Accordingly, Defendant's motion for summary judgment is granted and

Plaintiffs' cross-motion for summary judgment denied.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A fact is

"material only if it might affect the outcome of the suit under the applicable rule of law. Id.

Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

The burden of establishing that no "genuine issue" exists is on the party moving for summary

judgment. Celotex, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-

moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e). To do so, the non-moving party must "go beyond the pleadings and by her own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial'." Celotex, 477 U.S. at 324. In other

---

[4]      Plaintiffs argue for arbitration in their opposition to Defendant's motion for summary
judgment.  Because the Court already denied Plaintiffs' request in an opinion issued on July 21,
2010, the Court will not address that request again here.

words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Educ. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party."   Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The motion is appropriately granted when that party is entitled to judgment as a matter of law. Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990). Even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris v. Orman, No. 87-5149, 1989 WL 17549, at *8 (E.D. Pa. Mar. 1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, at *5 n. 8 (E.D. Pa. June 20, 2000).

## III.   CHOICE OF LAW PRINCIPLES

"In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits." Amica Mut. Ins. Co. v. Fogel, --- F.3d ---, 2011 WL 3930285, *3 (3d Cir. 2011).  In this case, New Jersey's conflict of law rules apply.

Where the parties have explicitly, or even implicitly, incorporated a choice of law provision into their insurance policy, courts may enforce the choice of law provision.  See e.g., Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161 (3d Cir. 1999) (holding that, under

Pennsylvania law, parties' inclusion of an Indiana uninsured motorist endorsement in automobile insurance policy may constitute an implied choice of Indiana law); Bell v. USAA Cas. Ins. Co., Civ. No. 2008-100, 2009 WL 2524351, *3 (D.V.I. Aug. 14, 2009) (holding that policy's repeated references to Massachusetts law constituted an implicit choice of that state's law); Blizzard v. Federal Ins. Co., Civil Action No. 05-5283, 2007 WL 675346, (E.D.Pa. Feb. 27, 2007) (holding that parties implicitly selected New Jersey law to govern New Jersey uninsured motorist endorsement).  For example, a policy may provide that "the law of the jurisdiction most favorable to the insurability of those damages shall control for the purpose of resolving any dispute between the Company and the Insured …."  Chubb Custom Ins. Co. v. Prudential Ins. Co. of America, 195 N.J. 231, 244 (2008).  Under New Jersey law, however, and for reasons discussed in more detail herein, choice of law provisions in insurance agreements are not always enforced by courts.  See e.g., Param Petroleum Corp. v. Commerce and Industry Ins. Co., 296 N.J.Super. 164 (App. Div. 1997) (refusing to enforce choice of law agreement where insured risk was in state).

Where the parties have not selected the law governing their insurance contract, New Jersey follows the Restatement (Second) of Conflict of Laws (1971) ("Restatement") "most significant relationship" test.  Id. (citing N.J. Mfrs. Ins. Co. v. MacVicar, 307 N.J.Super. 507, 512 (App. Div. 1998)).  The most significant relationship test provides that "the law of the state with the most significant relationship to the parties and the transaction under the principles stated in Restatement section 6 governs."  Id.

Before applying the most significant relationship test, however, courts must first "examin[e] the substance of the potentially applicable laws to determine whether there is a

distinction between them." P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008) (internal

quotation marks omitted).  In the insurance context, New Jersey's Appellate Division explains:

> [a]n actual conflict exists regarding an insurance contract when there is a conflict in the way each state interprets the policy, see 4 Holmes' Appleman on Insurance § 21.1 (2d ed. 1998), or when it would violate the public policy of the forum state to apply the law of the jurisdiction where the contract was formed, see 15 Corbin on Contracts § 79.7 (rev. ed 2003).

Pierides v. GEICO Ins. Co., No. L-3995-08, 2010 WL 1526377, (App. Div. Apr. 19, 2010).[5]

Once it is determined that an actual conflict exists, then New Jersey courts "identify the

governmental policies underlying the law of each state and how these policies are affected by

each state's contacts to the litigation and to the parties."   Smith v. Alza Corp., 400 N.J.Super.

529, 550 (App. Div. 2008) (quoting Veazey v. Doremus, 103 N.J. 244, 248 (1986)).

Thereafter, courts are to evaluate each state's contacts "according to their relative

importance" in analyzing which state has the most significant relationship.   Id. (quoting

Restatement, § 188(2)). These contacts include, but are not limited to, "the place of contracting

and performance, the location of the subject matter of the contract, and the domicile, residence,

nationality, place of incorporation and place of business of the parties."   Id.  Section 6 of the

Restatement directs courts to further consider this series of factors:

> (a) the needs of the interstate and international systems, (b) the relevant polices of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement, § 6.

---

[5]      Unpublished New Jersey decisions may not be cited as precedential authority.  However, I refer to this unpublished decision to explain a precept of law and not the decision's application of that law.

Another section of the Restatement, section 193, provides specific guidance for application of section 6 "to the special case of casualty-insurance contracts." Amica, 2011 WL 3930285, *5 (quoting Gilbert Spruance Company v. Pennsylvania Manufacturers' Ass'n Insurance Co., 134 N.J. 96 (1993)). Under section 193, which is "the starting point in determining the choice-of-law rule to govern casualty-insurance contracts," id. (internal quotation marks omitted), "the law of the state that 'the parties understood was to be the principal location of the insured risk [governs unless] some other state has a more significant relationship under the principles stated in § 6." Id. (alteration in original). Moreover, while courts should give great weight to the location of the vehicle, "the significance of the state of the [vehicle's] principal location diminishes with the length of time that it can be anticipated the [vehicle] will be in other states during the term of the insurance." Id. (quoting Restatement, § 193 cmt.b).

With these principles in mind, I turn to the application of the aforesaid choice of law principles and reach the substance of the parties' dispute.

## IV. DISCUSSION

Both parties' motions for summary judgment revolve around the same legal issues—what state's law governs interpretation of the Policy, whether Plaintiffs are entitled to coverage, and whether Plaintiffs' claims are barred by the statute of limitations. Because both motions involve these same issues, I need not separately analyze those issues in order to resolve both motions. For the reasons that follow, I conclude that Pennsylvania law governs interpretation of the Policy. Applying Pennsylvania law to interpret the Policy, I briefly address the parties arguments regarding whether Plaintiffs are entitled to UM coverage under the Policy or under Pennsylvania's UM statute, 75 Pa.C.S.A. § 1731 (a). The Court need not resolve these legal

12

issues, however, because it is clear that Plaintiffs' claims are barred by the applicable statute of limitations.  Accordingly, Defendant is entitled to summary judgment on this ground.

> **A.      Choice of Law**

The motor vehicle policy does not contain an express choice of law provision. Nonetheless, Plaintiffs argue that this Court should imply from the parties' inclusion of a Pennsylvania UM endorsement that its terms apply to a vehicle registered in Pennsylvania, and that the parties intended for Pennsylvania law to govern UM disputes related to vehicles registered in Pennsylvania.

As explained in Clover, parties may implicitly select governing law by including a state-specific uninsured motorist endorsement to the policy, where that endorsement had repeated references to, and "tracked" a particular state's law.  195 F.3d at 164-65.  The policy, in that case, included an endorsement titled INDIANA UNINSURED AND UNDERINSURED MOTORISTS COVERAGE that served to alter the Master Policy.  Id. at 165.  According to the Clover Court,

> [t]he Restatement makes clear that a contract's references to the laws of a particular state may provide persuasive evidence that the parties to the contract intended for that state's law to apply. The repeated references to Indiana law in the endorsement, and [the insurer's] unmistakable intent that the UIM coverage as set forth in the endorsement not only comply with, but clearly track Indiana law, demonstrate that the parties at least implicitly and perhaps even explicitly chose Indiana law to govern the policy's terms.

Id. at 165 (internal citations omitted).

The Clover court relied upon comment a of Restatement § 187 in support of its reasoning. That comment states, in pertinent part,

> even when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied. So the fact

> that the contract contains *legal expressions, or makes reference to legal doctrines, that are peculiar to the local law of a particular state may provide persuasive evidence* that the parties wished to have this law applied.

Restatement, § 187, cmt. a (emphasis added).  Clover, however, applied Pennsylvania law and this Court's research has not revealed a New Jersey case applying Comment a of Restatement § 187 to automobile policies.

One New Jersey Appellate Division decision, Param, supra, addresses choice of law provisions in insurance agreements.[6]  In that case, the Appellate Division noted that "choice-of-forum and choice-of-law agreements in liability insurance policies should generally be ignored at least when the insured risk is in this State."  296 N.J.Super. at 170.  Moreover, the Param court pointed to Section 193 of the Restatement, which provides that conflict of law provisions will not be given effect when the provision "designates a state whose local law gives the insured less protection than he would receive under the otherwise applicable law," unless "the insured enjoys a relatively strong bargaining position . . . , and particularly where . . . one or more of the insured risks is principally located in the state of the chosen law."  Id. at 172.

Based on Param, it appears that New Jersey courts prefer the application of New Jersey law to risks located in-state.[7]  Moreover, non-insurance specific case law in New Jersey suggests that courts do not tend to imply choice of law provisions into agreements covering in-state property.  See McCabe v. Great Pacific Century Corp., 222 N.J.Super. 397, 400 (App. Div.

---

[6]      In ascertaining whether a state supreme court would rule in a particular manner, federal courts may look to decisions of an intermediate appellate state court for guidance.  See Wisniewski v. Johns–Manville Corp., 759 F.2d 271, 273–74 (3d Cir. 1985) ("Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise.").

[7]      There is no New Jersey Supreme Court decision addressing choice of law provisions in insurance policies, thus, I treat Param as predictive of how the Supreme Court would treat such clauses.

1988) (holding that construction contract statement in recitals that the contract was "made . . . under Indiana law" did not implicitly choose Indiana law where property under construction was located in New Jersey).

In contrast, New Jersey courts will enforce clearly-stated choice of law provisions if the insured was in a relative strong bargaining position and the insured risk is not located in the state. See Param, 296 N.J.Super. at 172; 1-6 Appleman on Insurance § 6.01 (2011) ("A choice of law provision will be enforced only if it clearly expresses an intent for the policy to be controlled by the law of a particular jurisdiction."); cf. Caspi v. Microsoft Network, L.L.C, 323 N.J.Super. 118, 123 (App. Div. 1999) (distinguishing Param and holding that "as a general matter, enforcement of forum selection clauses is not contrary to public policy"); McCabe, 222 N.J.Super at 400 (stating, in construction contract context for property located in New Jersey, "it [i]s within the power of the parties to provide that the validity and interpretation of the[ir] contract [will] be governed by the laws of a state other than New Jersey."). This would suggest that New Jersey would enforce a choice of law provision in this case where the contracting parties (OTI and American Home) are two commercial entities with relatively equal bargaining power, and the pick-up truck was not registered or driven in New Jersey.

Before concluding whether a choice of law provision should be implied here, I briefly discuss another New Jersey decision that informs my analysis. In Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co., 250 N.J.Super. 51, 59 (App. Div. 1991), a case involving commercial liability insurance for a manufacturing company located in New Jersey, the New Jersey Appellate Division explained the challenges of determining what state's law applies to multi-state policies:

> In these days of multistate insurers, multistate insureds, and instantaneous interstate transmission of voice and document, it is

15

not easy to identify a state of contracting. A Delaware company, for example, secures a casualty insurance policy for a New Jersey site, among others, through a Philadelphia agent from an insurer with a Hartford home office that retains final underwriting approval on large policies. The handshake deal for the insurance is made over lunch in Manhattan. Choosing a *locus contractu* [place where the contract was formed] in such a case would be a difficult and perhaps pointless exercise. Pointless, because there is nothing about the choice that tells very much about the insurance transaction involved.

Id. at 59.

The court noted that, in such instances, the parties may "insert[ ] choice-of-law provisions in their policies" in order to achieve uniformity in interpretation. Id. Absent a choice of law provision, the court noted that Restatement § 193 directs that "rights under a casualty policy should ordinarily be decided under the substantive law of the state which the parties understood was to be the principal location of the insured risk." Id. at 60. In the court's view, there are two "axes" upon which to interpret policies that insure risks located in multiple states: uniform nationwide interpretation or site-specific interpretation. Id. Uniform nationwide interpretation is where the entire policy is interpreted under the law of one single state, regardless of where the risk is located. This approach "may well serve some interests to have a single reading of coverage and exclusion language that will bind in every state." Id. Site-specific interpretation, in contrast, applies the law of the state where the risk is located.

The Johnson Matthey court favors a site-specific interpretation because, for "multi-state insureds with national insurers[,] [t]heir insurance policies were contracted in many states, cover many geographically scattered risks and contain standard language of coverage and exclusion." Id. at 61. Site-specific interpretation is helpful, the court reasoned, because "[i]f each nationwide insurer comes to court with its own nationwide policy interpretation derived from a different state of contracting, the likelihood of conflict and confusion is clear." Id. Moreover, the court

16

viewed this approach as consistent with the parties' expectation at the time of contracting: "Where the policy covers many scattered risks . . . the reasonable expectations of the parties contracting for insurance for a particular risk can be satisfied if they know that policy language interpretation will follow the law at the site of the risk. Certainty and consistency are equally well satisfied." Id.

Notably, Johnson Matthey contrasted the multi-state liability policy at issue in its case with an automobile insurance policy "insuring a single vehicle that travels in various states …." Id. For such policies, the court noted, the New Jersey Supreme Court held in State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, (1980), that the law of state of contracting, as a factor under the Restatement's most significant contacts test, should direct the court's conflict of law analysis. Id. Johnson Matthey drew this conclusion from Simmons' reasoning that application of the law of state of contracting, in connection with the other Restatement factors,

> will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk ... and will furnish needed certainty and consistency in the selection of the applicable law.

Id. (quoting Simmons, 84 N.J. at 37). Thus, for an automobile policy that covers only one vehicle, "the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy . . . unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." Simmons, 84 N.J. at 37.

Lastly, I note that aspects of Johnson Matthey's reasoning were cited with approval by the New Jersey Supreme Court in Spruance, supra, another multi-state commercial liability policy case involving the disposal of waste products in New Jersey. In that case, the New Jersey Supreme Court explained that (absent an applicable choice of law provision), the court's analysis

17

must begin with Restatement § 193.   Thereafter, the Court expressed its disfavor for the nationwide interpretation approach:

> in adopting the aforementioned choice-of-law rule, we necessarily reject the uniform-contract-interpretation approach substantially for the reasons stated by the Appellate Division . . . in Johnson Matthey, supra ….

Id. at 895.

Moreover, the Spruance Court further explained why it disfavors the nationwide interpretation approach by quoting from Travelers Indemnity Co. v. Allied-Signal, Inc., 718 F.Supp. 1252, 1258 (D.Md. 1989) (supplemental memorandum), in which that court stated:

> short of congressional intervention or a limited overruling of the Erie doctrine to permit the development of a federal common law of contracts intended to be nationwide in scope, the existing dichotomous lines of substantive rulings, the maze of conflicts laws and litigation strategies of insureds and insurers alike make the achievement of such uniformity an illusion. The next best available alternative-required by the interests of the fair and sound administration of justice-is the deliberate and impartial resolution of the issues by the courts of the states whose interests are immediately affected during the course of litigation which can be effectively managed.

Id.

With the aforesaid principles in mind, I turn to the Policy at issue here.  The Policy does not contain an explicit choice of law provision, but includes state-specific endorsements for Minnesota, Wisconsin, Pennsylvania, and New Jersey.   The Pennsylvania and New Jersey endorsements, upon which the parties' dispute centers here, are respectively titled PENNSYLVANIA UNINSURED MOTORIST COVERAGE and NEW JERSEY UNINSURED AND UNDERINSURED MOTORISTS COVERAGE, and each applies to vehicles "licensed or principally garaged" in its borders.   They are both titled in the same manner as the Indiana endorsement in Clover, which endorsement the Third Circuit interpreted as persuasive evidence

18

that the parties implicitly choice Indiana law.  However, unlike <u>Clover</u>, the policy here includes multiple state-specific endorsements.  As noted, there are state-specific endorsements for Minnesota, Wisconsin, New Jersey, and Pennsylvania.  Many of these endorsements are drafted to render the Policy consistent with each state's law.  For example, the NEW JERSEY PERSONAL INJURY PROTECTION endorsement reflects New Jersey's no-fault insurance system whereas the PENNSYLVANIA BASIC FIRST PARTY BENEFIT endorsement contains language unique to that state's insurance system.  In addition, some of the state-specific endorsements contain different provisions than another state's endorsement.  For example, the Pennsylvania UM endorsement contains a four-year limitations period whereas the New Jersey UM endorsement does not, and New Jersey's typical six-year limitations period would apply to UM claims brought under that endorsement, <u>see</u> <u>Price v. New Jersey Mfrs. Ins. Co.</u>, 182 N.J. 519, 524 (2005).  Accordingly, the Policy's inclusion of several differing endorsements suggests that the parties did not implicitly choose one state's law to govern the entire agreement.

Rather, that each state-specific endorsement states that it applies only to those covered autos "licensed or principally garaged in" that state strongly suggests that the parties envisioned that the law of state where the vehicle was licensed or principally garaged would govern each dispute over a particular vehicle.  Thus, a New Jersey court would conclude that the parties implicitly chose to apply the state's law where the vehicle is licensed or principally garaged unless that court concluded that the insured was not in a relative strong bargaining position and the insured risk was not located in the state.  <u>See</u> <u>Param</u>, 296 N.J.Super. at 172.  Here, as noted, OTI is a commercial entity with comparable bargaining power to American Home, and the pick-up truck was not "located" in New Jersey at any time.  It was licensed and registered in Pennsylvania instead.

19

Moreover, enforcement of the parties' implicit choice of law is consistent with the site-specific interpretation approach adopted by the Johnson Matthey court for multi-state commercial liability policies.  Like those sorts of policies, the Policy here was negotiated through a multi-state process in many states and drafted to cover many geographically scattered risks.  The Policy was issued by a New York insurer to a New Jersey company to cover vehicles licensed or principally garaged in Minnesota, Wisconsin, New Jersey, or Pennsylvania.  As the Johnson Matthey court reasoned, "[w]here the policy covers many scattered risks . . . the reasonable expectations of the parties contracting for insurance for a particular risk can be satisfied if they know that policy language interpretation will follow the law at the site of the risk. Certainty and consistency are equally well satisfied."  250 N.J.Super. at 61.  The same rationale applies here where the "site of the risk" is analogous to the state in which a particular vehicle is licensed or garaged.  In that connection, interpreting the instant Policy as indicating that the law of the state where the vehicle is licensed or garaged controls also satisfies Simmons' directive that enforcement of a choice of law provision "comport with the reasonable expectations of the parties concerning the principal situs of the insured risk."  84 N.J. at 37.

Accordingly, for the foregoing reasons, I conclude that Pennsylvania law governs interpretation of the Policy in this case because the pick-up truck was licensed in Pennsylvania.[8]

---

[8]    I further note Plaintiff's request that "[i]f the Court were to find that the plaintiffs were not otherwise insured under the policy, they respectfully submit that discovery should be allowed into the issue of where the vehicle was principally garaged." Pl. Opp. to Def. Mot. at 5.  No such discovery is warranted.  Plaintiffs have already conceded that the vehicle was not garaged in New Jersey. Pl. Resp. Stat. Mat. Facts, ¶ 6.  See also Dry Afft., ¶ 8 ("Throughout the duration of the lease, the Ford Truck was not kept in New Jersey.").   In addition, the Pennsylvania endorsement applies to vehicles "licensed" in Pennsylvania.  Because Plaintiffs admit that the pick-up truck was "licensed" in Pennsylvania, see Dry Afft., ¶ 6 ("[T]he Ford Truck was registered in Pennsylvania and had a Pennsylvania license plate number ...."), and the Pennsylvania UM endorsement applies to vehicles licensed or principally garaged in the state, the Court need not determine where the vehicle was garaged in order to conclude that the

This ruling is in accordance with the reasoning of several other state and federal courts that have grappled with the interpretation of state-specific endorsements that apply to vehicles located within a particular state.   See, e.g., Blizzard, 2007 WL 675346, *3 (holding that inclusion of a "NEW JERSEY UNINSURED AND UNDERINSURED MOTORISTS COVERAGE" endorsement constitutes a "state-specific add-on to the . . . policy . . . [which indicates] that the parties to the policy would consequently expect that it would be governed by New Jersey law . . ." where that endorsement contained policy provisions "relevant to [the instant] dispute"); Collins v. St. Paul Mercury Ins. Co., 381 Ill.App.3d 41, 46 (Ill. App. Ct. 2008) (holding that Illinois law applied to vehicle registered and garaged in Illinois where policy contained "separate . . . endorsements for each state in which [the insured] ha[d] vehicles registered" and where the endorsements stated that they applied "to vehicles which are registered and garaged within that state."); Byer v. Wright, 160 Ohio App.3d 472, 476  (Ct. App. Ohio 2005) (applying Ohio law to multi-state policy with several state-specific endorsements, including an Ohio UM endorsement covering vehicles registered and principally garaged in Ohio, and concluding that the endorsement "evidenced intent by the parties to be bound by Ohio law."); Ellis v. Royal Ins. Cos., 129 N.H. 326 (1987) (holding that New Hampshire law governed multi-state policy where the policy "covered a multitude of risks located in various States" and included New Hampshire UM endorsement that applied vehicles registered, garaged, and driven in New Hampshire).  See also U.S. Fidelity & Guar. Co. v. Smith, 171 F.Supp.2d 484 (E.D.Pa. 2001) (applying New

---

Pennsylvania endorsement is applicable here.  Accord Mitchell v. Providence Washington Ins. Cos., 255 F.Supp.2d 487, 491 n.4 (E.D.Pa. 2003) (holding that policy's inclusion of New Jersey underinsured motorist endorsement was an implicit choice of New Jersey law where vehicle was registered in New Jersey).  Furthermore, Plaintiffs advocate for the application of Pennsylvania law—consistent with this Court's finding.

Jersey law to multi-jurisdictional policy involving vehicle licensed and principally garaged in New Jersey).

Having concluded that the parties implicitly selected Pennsylvania law, there is "no need to undertake [a Restatement] analysis." Todd v. Liberty Mutual Fire Insurance Co., No. 00-CV-2533, 2001 WL 33771 (E.D.Pa. Jan. 12, 2001). See also Clover, 195 F.3d at 164 ("[T]he Restatement of Conflict of Laws provide that the first question to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly have chosen the relevant law."). Assuming for the sake of argument that a Restatement analysis was required, I would conclude that there an actual conflict between New Jersey's and Pennsylvania's statute of limitations.[9]  In that instance, the New Jersey Supreme Court would conclude that Pennsylvania law should apply under New Jersey's most significant contacts test because, under that test, the location of the insured risk is the most significant contact. See Spruance, 134 N.J. at 104.  Here, the vehicle is licensed in Pennsylvania, thus, the New Jersey Supreme Court would conclude that Pennsylvania law applies.[10]

---

[9]      As explained in my July 21, 2010 Opinion, both New Jersey and Pennsylvania interpret insurance policies with the following canons of construction in mind:

> In both New Jersey and Pennsylvania, "it is evident that the court should give the words of [an insurance] policy 'their plain, ordinary meaning'." Moreover, "if the words of a policy are clear, the policy should be interpreted as written." Nonetheless, an insurance contract is a contract of adhesion and any ambiguity in the language will be construed in order to honor the objectively reasonable expectations of the insured.

Slip Op. at 4 (internal citations omitted) (citing cases).  Thus, there is no actual conflict regarding how each state interprets policies.  However, as noted, the New Jersey limitations period is six years whereas the limitations period in the Pennsylvania UM endorsement, in accordance with Pennsylvania law, is only four years.

[10]      While one could argue that section 193 of the Restatement suggests that the location of the vehicle carries less weight when "it can be anticipated [that] the [vehicle] will be in the other

**B.      Coverage**

In interpreting insurance policies, Pennsylvania courts look first to the plain language of the policy and give the words of the policy their plain and ordinary meaning.  Progressive Northern Ins. Co. v. Schneck, 572 Pa. 216, 220-21 (2002).   While any ambiguities will be construed in favor of the insured, unambiguous policy language will be interpreted as written. Id. at 221.  Defendant makes two arguments as to why Plaintiffs are not entitled to coverage under Pennsylvania law.  The first argument is based on the plain language of the Policy.  The second argument relates to Pennsylvania's uninsured motorist statute.  I address each in turn.

**1.      "Covered Auto"**

Defendant first argues that the Plaintiffs are not entitled coverage under the plain language of the Policy.  The plain language of Section II, in the Master Policy, states that Defendant's liability is limited to injury or damage "resulting from the ownership, maintenance or use of a covered auto." Pursuant to the Policy, UM coverage is limited to symbol 2 vehicles which are defined as "only those autos you own." Moreover, the Policy does not provide UM coverage for symbol 8 vehicles, which are defined as leased, hired, rented or borrowed vehicles. It is undisputed that the pick-up truck was not owned by OTI, but was leased by OTI from Danella in March 2004. As the truck is a leased vehicle, it would be classified as a symbol 8 vehicle and therefore, is not a covered auto for the purposes of UM benefits.  Thus, pursuant to the plain language of Section II of the Master Policy, Defendant is not liable because Plaintiffs' injuries did not result from the "ownership, maintenance or use of a covered auto."

_____

states during the term of insurance," as between New Jersey and Pennsylvania, the licensing and registration of the Vehicle in Pennsylvania nonetheless creates more significant contracts with that state than New Jersey.

Nor is there coverage under the Pennsylvania UM endorsement.  The endorsement states that "[w]ith respect to coverage provided by this endorsement, the provisions of the [Master Policy] apply unless modified by the endorsement."  See Pennsylvania Uninsured Motorist Endorsement at 1.  As noted, the endorsement expressly states that it applies to a "covered 'motor vehicle' licensed or principally garaged in . . . Pennsylvania."  Id.  By incorporating the definition of "covered 'motor vehicle'" from the Master Policy, the endorsement makes clear that it applies only to owned vehicles.  Moreover, although Pennsylvania courts favor UM coverage, courts have enforced commercial employer policies that do not provide UM coverage to non-owned vehicles.  See Caron v. Reliance Ins. Co., 703 A.2d 63, 69 (Pa. Super. Ct. 1997); cf. Richardson v. Selective Ins. Co. of Am., No. 10-4024, 2011 WL 2135609, at *5 (E.D. Pa. May 31, 2011) ("there is nothing in Pennsylvania public policy which prohibits an insurer from issuing a policy which insures a company's vehicles, but restricts the extent of an employee's coverage to when he/she is operating one of those vehicles.").  Accordingly, there is no coverage under the plain language of the Pennsylvania UM endorsement for the leased pick-up truck Plaintiffs were driving at the time of the accident.  Accord Travelers Property Cas. Co. of America v. State Auto. Mut. Ins. Co., No. 07-cv-0754, 2008 WL 686905, *6 (W.D.Pa. Mar. 10, 2008) (finding no coverage for employee where "the rental vehicle did not qualify as a covered auto because only owned autos qualified as covered autos").[11]

---

[11]     If I had determined that New Jersey law applied, I would reach a similar construction of the New Jersey UM endorsement.  See Dickson v. Selective Ins. Grp., Inc., 363 N.J.Super. 344, 250-51 (App. Div. 2003) (holding that shareholder of company not entitled to UM coverage for non-covered vehicle leased by the shareholder for business purposes).  And, in my view, New Jersey law would not find such a reading of the Policy to be contrary to its public policy.  See Progressive Cas. Ins. Co. v. Hurley, 327 N.J.Super. 179, 182-83 (App. Div. 2000) rev'd on other grounds by Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260 (2001) ("[New Jersey law] requires a UM and UIM insurance provision only for vehicles registered or principally garaged in this

However, even though the pick-up truck is not a "covered auto" under the Master Policy or the Pennsylvania UM endorsement, the Additional Insured endorsement language in the Policy creates an ambiguity, by granting additional insured status to those persons or organizations for whom OTI is obligated by contract to provide auto coverage.   That endorsement provides:

> *This endorsement modifies insurance provided under the following:*
>
> BUSINESS AUTO COVERAGE FORM
>
> Any person or organization to whom you become obligated to include as an additional insured under this policy, as a result of any contract or agreement you enter into which requires you to furnish insurance to that person or organization of the type provided by this policy, but only with respect to liability arising out of your operations or premises owned by or rented to you.  However, the insurance provided will not exceed the lesser of:
>
> 3.      The coverage and/or limits of this policy, or
>
> 4.      The coverage and/or limits required by said contract or agreement.

Ferguson Afft., Exh. 1 ("ADDITIONAL INSURED – WHERE REQUIRED UNDER CONTRACT OR AGREEMENT").

As noted, the lease agreement between Danella and OTI explicitly requires OTI to "carry and maintain . . . Auto Liability [insurance] with limits of liability of no less than $1,000,000." Dry Afft., Exh. 1 ("Danella Rental Systems, Inc. Equipment Rental Agreement") at 1.  The lease agreement also required that OTI "name [Danella] as an additional insured" on the policy that covered OTI's vehicles.  Id.  Because the lease agreement is an "agreement [OTI] enter[ed] into

---

State. . . . There is no requirement to provide UM coverage for a borrowed, out-of-state vehicle that is neither garaged nor being operated in this state.") (citing N.J.S.A. 17:28-1.1).

which requires [OTI] to furnish insurance . . . of the type provided by th[e] policy," the Additional Insured endorsement appears to create coverage for Danella under the Policy.

That Danella is an additional insured under the Policy creates an interpretative ambiguity. On the one hand, the definition of "covered auto" on the Business Auto Coverage Form Declarations Page and in the Master Policy explicitly applies to only those vehicles owned by OTI and, therefore, excludes leased vehicles.   On the other hand, the Additional Insured endorsement "modifies insurance provided under" the Business Auto Coverage Form (i.e., the Master Policy) by adding Danella as an additional insured, even though Danella is the leasing company and any vehicle leased from Danella would not be owned by OTI.  One could argue that adding another party as an additional insured does not alter the definition of "covered auto" under the Policy.  But, in this instance, interpreting the Policy in that manner would render the Additional Insured endorsement language superfluous.

As this monologue illustrates, while ambiguous policy language must be construed in favor of the insured, how the Additional Insured endorsement modifies the Master Policy presents thorny questions of interpretation.  In this case, I need not decide whether the pick-up truck is a "covered auto" under the Policy because it is clear that Plaintiffs' claims are barred by the statute of limitations for the reasons discussed below.

### 2.      Pennsylvania's Uninsured Motorist Statute

Plaintiffs further argue that, if the pick-up truck is not a "covered auto" under the Policy, the Court should read such coverage into the policy in light of Pennsylvania's uninsured motorist insurance statute, 75 PA. CONS. STAT. ANN. § 1731(c) (West 1995) ("section 1731").  Plaintiff argues that, under section 1731(c), an automobile insurance policy must offer UM coverage. The only way that an insured may reject coverage, Plaintiffs further argue, is if the insurer

obtains the insured's signature on a specific waiver form set forth in the statute.  If no waiver is obtained, a court shall grant coverage "under that policy . . . equal to the bodily injury liability limits." Id. § 1731(c)(1) ("Any rejection form that does not specifically comply with this section is void. If the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits."). Defendant, in response, argues that section 1731's waiver requirement does not apply, and cites Pennsylvania case law in support of its argument.   While the parties' arguments present interesting questions of Pennsylvania law, the Court need not decide whether section 1731 is applicable here because Plaintiffs' claims are clearly barred by the statute of limitations.

### B.      Statute of Limitations

As noted, Defendant argues that Plaintiffs' claims are barred by the Pennsylvania UM endorsement's four-year statute of limitations.  Plaintiffs maintain that the four-year statute of limitations should be tolled because "there were numerous correspondence going back and forth concerning the plaintiff's [sic] UM claim" that would "qualify as a written demand for arbitration." Pl. Br. in Supp. Cross-Mot. at 15-16.  In response, Defendant argues that no written demand for arbitration was made within the statutory period. The Court finds Plaintiffs' arguments to be meritless.

As noted, the Pennsylvania UM endorsement includes a four-year statute of limitations period.  This is consistent with Pennsylvania law, which mandates that contract actions be commenced within four-years "from the time the cause of action accrued." 42 Pa. C.S.A. § 5502(a), and "the statute of limitations applicable to contract actions governs uninsured motorist claims." Clark v. State Farm Auto. Ins. Co., 599 A.2d 1001, 1005 (Pa. Super. Ct. 1991) (citing Boyle v. State Farm Mutual Auto Ins. Co., 456 A.2d 156 (Pa. Super. Ct. 1983)).  In Boyle, the

Superior Court of Pennsylvania created a three-prong test for determining when a cause of action accrues for limitations purposes.  The cause of action accrues when: (1) the insured is in a motor vehicle accident; (2) the insured sustains bodily injury as a result of the accident; and (3) the insured knows of the uninsured status of the other owner or operator.  Clark, 599 A.2d at 1005.

Here, the accident occurred, and Plaintiffs sustained bodily injuries, on November 27, 2004.  Furthermore, since a phantom vehicle caused the accident, Plaintiffs became aware of the uninsured status of the other operator on that date, as an unidentified vehicle is "presumptively uninsured" as a matter of law.  Seay v. Prudential Property and Cas. Ins. Co., 375 Pa.Super. 37, 42 (Pa. Super. Ct. 1988); State Farm Mut. Auto. Ins. Co. v. Rosenthal, 484 F.3d 251, 254 (3d Cir. 2007) (citing Seay, 375 Pa.Super. at 42)).  Thus, the cause of action accrued on the date of the accident, and Plaintiffs had four years from that date to compel arbitration.  Because Plaintiffs did not bring their suit until July 20, 2009, which is more than four years after the cause of action accrued on November 27, 2004, their suit was not instituted within the limitations period.  To fall within the ambit of the limitations period, Plaintiffs should have brought their suit by November 27, 2008 instead.

Nevertheless, Plaintiffs argue that their claim is not barred, as the statute of limitations should be tolled.  Under Pennsylvania law, a statute of limitations may not be tolled due to lack of knowledge, mistake or misunderstanding.  Miller v. Keystone, 636 A.2d 1109, 1114 (Pa. 1994); Walker v. Providence Ins. Co., No. 97-7455, 1998 WL 195652 (E.D. Pa. Mar. 31, 1998).  However, the statute may be tolled if "the insurer fraudulently or deceptively lulls the insured into inaction." Miller, 636 at 1114.  See also Wilson v. Transport Ins. Co., 889 A.2d 563, 574 (Pa. Super. Ct. 2005).  Otherwise stated, this occurs when a defendant "lulls an injured person or his representatives into a sense of security so that such person's vigilance is relaxed, then [the

defendant] is estopped from evoking the statute ….." Haggart v. Cho, 703 A.2d 522, 527 (Pa. Super. Ct. 1997).

In Walker, the District Court for the Eastern District of Pennsylvania refused to toll the statute for a plaintiff who had failed to file a motion to compel arbitration within the statutory period. 1998 WL 195652, at *3.  There, plaintiff failed to claim in its affidavit that the defendant insurance company had "agreed to actually waive or toll the statute of limitations." Id. Furthermore, the court observed that "an able lawyer" would have known when the statute of limitations expired and filed a motion within that period. Id.  The court concluded that it was "not fair to penalize the defendant for the inactions of plaintiff's counsel." Id.  While Walker is a federal, rather than, state court decision, I find its decision consistent with Pennsylvania law and treat it as persuasive authority of how the Pennsylvania Supreme Court would rule.

Here, Plaintiffs merely claim that Defendant "never asserted that the four year statute of limitations period would apply" and that Defendant "also continued settlement discussions after the period expired." Pls. Br. Opp. Summ. J. 16. In reviewing the correspondence between Plaintiffs' former counsel and Defendant, it is true that Defendant acknowledged the possibility of settlement beginning in August 2006, when Defendant's representative stated "[i]t is our understanding that you are still putting together [the Plaintiffs'] UIM demands."  Letter from Jeffrey E. Lucas dated Aug. 17, 2006 at 2, through the spring of 2009, at which point Plaintiffs' former counsel and one of Defendant's representatives exchanged emails discussing settlement possibilities.  See generally Levinson Afft., Exh. B.  And, indeed, the statute of limitations expired on November 27, 2008, while the settlement discussions were ongoing.

However, Defendant's representative also stated in the November 1, 2005 correspondence that Defendant was "confirming that [the pick-up truck] is in fact owned by our

insured …., " thereby highlighting the coverage issue for Plaintiffs' former counsel.  Letter from Jeffrey E. Lucas dated Nov. 1, 2005 at 1.  More to the point, Defendant denied Plaintiffs' claim outright on December 15, 2006, stating that OTI's "policy, for UM/UIM coverage, only insures owned vehicles. . . . As we have discussed this vehicle was on a month to month lease.  It is not an owned auto.  Therefore it does not fit the definition of an owned auto."  Letter from Jeffrey E. Lucas dated Dec. 15, 2006 at 1.  Thus, while settlement negotiations may have continued after the statute of limitations expired, Defendant's denial of coverage makes it clear that Defendant did not fraudulently or deceptively lull Plaintiffs into believing a favorable resolution was forthcoming.

That Defendant also did not highlight, for Plaintiffs' former counsel, the expiration of the limitations period does not alter my analysis.  It is not Defendant's obligation to inform learned counsel of the applicable limitations period.  Moreover, the correspondence from Plaintiffs' former counsel confirms that he was considering suit and, consequently, is presumed to have informed himself of the applicable limitations period.  During the time frame from August 2006 through the spring of 2009, Plaintiffs' former counsel indicated that he would "decide if [Plaintiffs] should file a lawsuit in Pennsylvania, Ohio, Wyoming or New Jersey, or chose [sic] to arbitrate the matter." .  Id., Exh. 3 (Letter from William J. Vosper, Esq. dated Dec. 7, 2006) at 2.  Plaintiffs' former counsel made a similar threat of litigation on September 29, 2007, along with an increased settlement demand for Jeffrey Walters.  In that letter, he urged Defendant to settle in order "[t]o avoid . . . respective costs of litigation for uninsured motorist benefits in one of several jurisdictions …."  Id., Exh. B (Letter from Maryjean Ellis, Esq., dated Sept. 29, 2007) at 1.

Reading the correspondence as a whole, while the parties engaged in some settlement negotiations, Plaintiffs have not demonstrated that Defendant undertook fraudulent or deceptive action in an effort to lull Plaintiffs into inaction.  Furthermore, as is revealed by Plaintiffs' former counsel's repeated threats of litigation, counsel had considered the possibility of suit and an able lawyer would have known that a motion had to be filed within four years of the accident. Indeed, Plaintiffs' former counsel argued, in his September 2, 2005 and June 4, 2007 letters, that Pennsylvania law applied to Plaintiffs' claims.  In the September 2, 2005 letter, he even referenced the arbitration clause found in the Pennsylvania UM endorsement—the same endorsement that contains the four-year limitation period.  And, as in <u>Walker</u>, nothing in the correspondence states or suggests that Defendant agreed to waive or toll the statute of limitations.  Finally, Plaintiffs cite several cases to support their position, but each case pertains to the tolling of New Jersey's statute of limitations, which is irrelevant to the matter at hand. Indeed, it is Plaintiffs who advocate for the application of Pennsylvania law.

Thus, I find no reason to toll Pennsylvania's statute of limitations in this case. Accordingly, the Court concludes that Plaintiffs' claims are barred by the governing statute of limitations.

## V.     CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Cross-Motion for Summary Judgment is DENIED.

/s/  Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

Dated:        September 21, 2011